IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| P. TODD HOLLOWAY,<br><br>      Plaintiff,<br>v.<br><br>DOUGLAS E. BROWN *et al.*,<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER DENYING THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:18-cv-462-JNP-CMR<br><br>District Judge Jill N. Parrish |

This matter is before the court on a Motion for Summary Judgment filed by Intervenor Plaintiff the United States ("the government"). [Docket 82]. The government's motion for summary judgment is DENIED.

## BACKGROUND

### I. The Browns' Obligations to the United States Government

This dispute arose between Douglas E. Brown and Barbara L. Brown (collectively, "the Browns") and P. Todd Holloway over ownership of a piece of property located in Holladay, Utah (the "Meadowcrest Property"). The government intervened, asserting that both Mr. and Mrs. Brown have unpaid tax assessments that have been reduced to judgment and that the United States therefore has federal liens and tax judgments encumbering their property. It alleges that both Mr. and Mrs. Brown have ownership interests in the Meadowcrest Property and asserts that it is entitled to foreclose its liens on the Meadowcrest Property.

### II.  The Wrenhaven Trust

In 1994, the Wrenhaven Trust was created for the benefit of Mrs. Brown and the Browns' four children. Robert D. Tingey, a relative of Mrs. Brown, was appointed the trustee. The Browns and Wrenhaven Trust allege that the trust was created as an estate planning tool and that it was intended to hold the Browns' family homes. Upon the trust's creation, the Browns transferred their family home (the "Wrenhaven Property") to the trust by quitclaim deed. The Wrenhaven Trust did not provide consideration for the transfer. After the Wrenhaven Property was transferred, the Browns continued to live at the property and made the mortgage and utility payments.

The Wrenhaven Trust sold the Wrenhaven Property in 1997 and used the proceeds from that sale to purchase a different property (the "Senoma Property"). The Browns lived at the Senoma Property until 2002, when the Wrenhaven Trust sold the Senoma Property to one of the trust's beneficiaries.

### III.  The Purchase of the Meadowcrest Property

At issue in this case is the Meadowcrest Property, a home to which the Browns moved after the sale of the Senoma Property. Mrs. Brown alleges that she identified the Meadowcrest Property in February of 2002. The Wrenhaven Trust and Browns allege that the proceeds of the Senoma Property's sale, an estimated $125,000, were used to partially fund the purchase of the Meadowcrest Property. They further allege that, at the time of the Meadowcrest Property's purchase, Mrs. Brown sought and was unable to obtain financing for the remaining funds required to purchase the home, approximately $245,000.

In order to obtain financing, the Wrenhaven Trust and Browns allege that they entered an agreement with Mr. Holloway, a "work friend" of Mr. Brown's. The parties agreed that Mr. Holloway would obtain a mortgage for the Meadowcrest Property and take title. The Browns

2

would then arrange for the down payment, make monthly payments on the loan, and take care of the taxes, insurance, utilities, and maintenance for the property. The parties allegedly agreed that Mr. Holloway would convey title to the property after the mortgage had been fully paid. In exchange, Mr. Holloway would obtain the benefit of an exchange under 26 U.S.C. § 1031, allowing him to sell real property that he held in California and offset the capital gains taxes on that sale with the purchase of the Meadowcrest Property. The parties dispute the nature of their respective interests in the property as a result of their agreement. While the Browns argue that this agreement provided the Wrenhaven Trust with equitable ownership of the property, Mr. Holloway characterizes the agreement as a lease with a purchase option.

In November of 2002, the parties closed on the purchase of the Meadowcrest Property. A $123,750 down payment was provided and title was conveyed to Mr. Holloway. The parties dispute the source of the down payment. The Browns allege that the funds were provided by the Wrenhaven Trust using the proceeds from the Senoma Property sale, while the government alleges that the Browns provided the payment. The parties all agree, however, that Mr. Holloway obtained a mortgage from Universal Mortgage to cover the remaining balance on the property, approximately $245,000. The mortgage was later acquired by U.S. Bank.

### IV.   The Browns Reside at the Meadowcrest Property

Since November of 2002, the Browns and their four children have resided at the Meadowcrest Property. In addition, the Browns and one of their daughters have made monthly payments during their residence at the property. For approximately one year, these payments were sent to Mr. Holloway. In the following years, the payments were sent directly to the mortgage company. Almost all of the checks were sent by Mr. Brown or Mrs. Brown. Some of the checks were designated "rent" on the memorandum line. Mr. Holloway argues that these were in fact rent

payments, while the Browns, Wrenhaven Trust, and government contend that these payments constituted mortgage payments. In addition, the Browns have paid the property taxes, utilities, and insurance, and have managed the repairs and improvements to the property with no input from Mr. Holloway.

### V.     The Dispute Between the Browns and Mr. Holloway

In 2006, Mr. Holloway pledged the Meadowcrest Property as security on a loan that he had obtained from the Bank of America. Neither the Browns nor Mr. Tingey were aware of the loan. The Browns allege that Mr. Holloway obtained the loan without disclosing to the Bank of America that a separate party had provided the down payment for the property and had been making payments on the mortgage. Mr. Holloway defaulted on the loan and the Bank of American threatened foreclosure on the Meadowcrest Property. Mrs. Brown alleges that she became aware of the loan in 2012. She further alleges that she became aware that the loan had been satisfied in 2016 and that, around that time, she filed a notice of interest in the Meadowcrest Property with the Salt Lake County Recorder. This filing was the first public recording of the parties' alleged agreement. Mr. Holloway contends, however, that it was a fraudulent filing and that it did not accurately represent his lease agreement with the Browns.

In June of 2017, Mr. Holloway filed suit in the Third Judicial District Court for the State of Utah to quiet title to the Meadowcrest Property, alleging that the Mrs. Brown had recorded a wrongful lien on the property. In May of 2018, the United States filed an intervenor complaint to enforce federal tax liens and judgment liens attached to all property and rights to property of Mr. and Mrs. Brown. The government sought to foreclose on the Meadowcrest Property at issue in this proceeding. The following month, the government removed this case to the United States District Court for the District of Utah.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).

## ANALYSIS

The government seeks summary judgment on its intervenor complaint against the Browns, asserting that the Unites States' tax liens attach to the Browns' interest in the Meadowcrest Property. The government argues that Mr. Holloway is a nominee for the Browns and that the Browns hold an interest in the Meadowcrest Property through either a purchase money resulting trust ("PMRT" or "resulting trust") or a constructive trust. The government also contends in its complaint that the conveyance of the Meadowcrest Property to Mr. Holloway was a fraudulent transfer under Utah law. The government thus seeks to foreclose on the Meadowcrest Property.

### I.   Enforcement of Nominee Liens

Enforcement of a nominee lien as is sought in the government's motion for summary judgment involves a two-step inquiry. First, state law applies to determine the nature of party's interest in the property. *United States v. Craft*, 535 U.S. 274, 278–79 (2002); *Arlin Geophysical Co. v. United States*, No. 2:08-CV-00414-DN-EJF, 2018 WL 4621748, at *7 (D. Utah Sept. 26, 2018), *aff'd,* 946 F.3d 1234 (10th Cir. 2020). Second, if a property interest under state law has been identified, federal law determines whether federal liens can attach. *Craft*, 535 U.S. at 279; *Drye v. United States*, 528 U.S. 49, 58 (1999); *Holman v. United States*, 505 F.3d 1060, 1067 (10th Cir. 2007).

The government argues that the Browns hold an interest in the Meadowcrest Property through either a purchase money resulting trust ("PMRT" or "resulting trust") or constructive trust under Utah law. As will be addressed, the government has not met its burden of establishing that either of these trusts arises. Thus, the court need not engage in the second step of the inquiry.

A. Purchase Money Resulting Trust ("PMRT")

The government first argues that Mr. and Mrs. Brown have an interest in the Meadowcrest Property by virtue of a purchase money resulting trust. Mr. Holloway contests this claim, arguing that no such trust exists and that he properly holds title to the Meadowcrest Property. The Browns and the Wrenhaven Trust also dispute the government's allegation, arguing that a resulting trust does exist, but that the Wrenhaven Trust is the trust's beneficiary.

The party alleging variance from a deed that is presumed to convey title clearly and unambiguously has the burden of proving the variance by clear and convincing evidence. *In re Hock's Estate*, 655 P.2d 1111, 1114 (Utah 1982). However, a PMRT is presumptively created "[w]here a transfer of properties is made to one person and the purchase price is paid by another." *Id.* at 1115 (quoting RESTATEMENT (SECOND) OF TRUSTS § 440 (1959)). Thus, "[t]he fact which must be proven in the case of a [PMRT] is that one party paid the purchase price for property and another party was given legal title." *Id.*

At this stage of the litigation, the court is unable to conclude that the Browns paid the Meadowcrest Property purchase price. Factual issues contradict the government's position and cannot be resolved at the summary judgment stage. First, Mr. Holloway contests the claim that he did not contribute to the property's purchase, arguing that he provided the mortgage and thus was responsible for providing approximately 64% of the purchase price. Second, the Browns and Wrenhaven Trust contest the government's position that the Browns supplied the down payment

6

and provide evidence to suggest that the Wrenhaven Trust, rather than the Browns, provided the remaining 36% of the purchase price.

1) Mr. Holloway's Interest in the Meadowcrest Property

The government and the Browns argue that Mr. Holloway has put no money into the Meadowcrest Property and that he therefore has no interest in the property. This is a mischaracterization of Mr. Holloway's participation in the purchase of the Meadowcrest Property. Although he did not provide the down payment, Mr. Holloway obtained a mortgage to cover approximately 64% of the Meadowcrest Property purchase price. In doing so, Mr. Holloway tied up his credit and took considerable financial risk if the Browns stopped making monthly rent payments.

Had Mr. Holloway provided the remaining funds in cash, there would be no dispute over whether he supplied a portion of the Meadowcrest Property purchase price. The fact that he provided those funds through a mortgage, rather than in cash, does not alter his role in the transaction. Mr. Holloway was responsible for the provision of 64% of the Meadowcrest Property purchase price. The court is unconvinced by the government's and Browns' suggestion that that the provision of these funds can be characterized as a failure to pay the purchase price. The government has failed to demonstrate that a purchase money resulting trust in a different party, one whom did not provide a majority of the purchase price through a mortgage, would be proper.

2) Source of the Down Payment

Despite Mr. Holloway's apparent provision of approximately 64% of the Meadowcrest property purchase price, the government argues that the Browns paid the purchase price because they provided the down payment on the house. But even after disregarding the flaws with this argument addressed above, the government cannot establish that the Browns actually provided the Meadowcrest Property down payment.

The government first argues that the payment came directly from the Browns and that the Wrenhaven Trust has contributed nothing to the Meadowcrest Property. The government argues in the alternative that the Wrenhaven Trust is nothing more than a guise to conceal the Browns' interest, and thus any payment from the trust can be traced to the Browns. However, the government has failed to demonstrate that these allegations are supported by undisputed facts. Even if the court disregards Mr. Holloway's significant contribution to the Meadowcrest Property purchase price, the government cannot demonstrate that the Browns provided any portion of the purchase price.

a) Argument That the Browns Directly Provided the Down Payment

The government first argues that the Browns were the direct payors of the Meadowcrest Property's down payment and that they are therefore beneficiaries of a PMRT holding the property. The Browns and the Wrenhaven Trust contest this position, contending that the Wrenhaven Trust provided the down payment for the property and that any resulting trust must therefore exist to the benefit of the Wrenhaven Trust.

Genuine factual disputes underlie this conflict. The government notes that the down payment was sent from an account held by the D.E. Brown Family Trust, rather than the Wrenhaven Trust.[1] The Browns, on the other hand, claim that the Wrenhaven Trust did in fact provide the down payment. They argue that the money can be traced to the sale of the Senoma Property, a property to which the Wrenhaven Trust held title. Thus, the Wrenhaven Trust's property was the source of the down payment. The Browns and the Wrenhaven Trust assert that

---

[1] Another court in the District of Utah found in 2011 that the D.E. Brown Family Trust was a nominee of the Browns, holding property in a resulting trust in favor the Browns. *United States v. Brown*, Nos. 7-CV-810, 10-CV-127, 2011 WL 4889520, at *24 (D. Utah Oct. 11, 2011), *aff'd sub nom. United States v. Tingey*, 716 F.3d 1295 (10th Cir. 2013).

8

the trustee of the Wrenhaven Trust placed the proceeds from that sale in the D.E. Brown Family Trust's account as a necessity because no bank account existed for the Wrenhaven Trust. Essentially, they argue that the funds were held by the D.E. Brown Family Trust for the benefit of the Wrenhaven Trust.

At the summary judgment stage, the burden rests with the government to demonstrate the lack of any material factual dispute. But the tracing of the down payment to the sale of the Senoma Property suggests that the Wrenhaven Trust, rather than the Browns, provided the down payment for the Meadowcrest Property. Thus, there exists a factual dispute over whether the Browns provided the down payment.

### b) Argument That the Wrenhaven Trust is the Browns' Nominee

In the alternative, the government argues that the Wrenhaven Trust is a nominee of the Browns. Thus, it argues that a down payment provided by the Wrenhaven Trust can be attributed to the Browns. To support this contention, the government claims that the Browns retained a beneficial interest in the Wrenhaven Property when they initially funded the Wrenhaven Trust in 1994. While the government does not identify the applicable legal standard for evaluating the relationship between the Wrenhaven Property and the Browns, the court assumes for purposes of this motion that the government argues the Browns are the beneficiaries of a resulting trust and that the Wrenhaven Trust is their nominee.

As has been addressed, a PMRT is presumptively created "where a transfer of properties is made to one person and the purchase price is paid by another." *In re Hock's Estate*, 655 P.2d at 1115 (quoting RESTATEMENT (SECOND) OF TRUSTS § 440 (1959)). An exception to this rule exists, however, when the transferee is the "natural object of bounty of the person by whom the purchase price is paid." *Parks v. Zions First Nat'l Bank*, 673 P.2d 590, 598 (Utah 1983) (quoting

9

RESTATEMENT (SECOND) OF TRUSTS § 442). In such cases, "a purchase money resulting trust will not arise unless the one paying the purchase price manifests an intention that the transferee should not have the beneficial interest in the property." *In re Hock's Estate*, 655 P.2d at 1116; *see also United States v. Tingey*, 716 F.3d 1295, 1302 (10th Cir. 2013) (noting that a transfer to the payor's wife, child, or other natural object of bounty is an exception to the general presumption of a resulting trust); *In re Taylor*, 133 F.3d 1336, 1341 (10th Cir. 1998) (stating that the presumption of a PMRT is reversed when the transferee is a natural object of the payor's bounty).

Though the transferee in this case was the Wrenhaven Trust, the beneficiaries of that trust fall precisely into the category to which this exception applies. *See Tingey*, 716 F.3d at 1302. The government thus bears the burden of proving that the Browns did not intend the Wrenhaven Trust to have beneficial ownership of the Wrenhaven Property at the time of transfer.

The circumstances surrounding the transfer can provide evidence of the payor's intention. *Id.* For example, the intention to create a PMRT may be found when "the circumstances are such that the payor would have a reason for taking title in the name of another other than an intention to give him the beneficial interest . . . as, for example, where the payor had reasons for wishing that it should not be known that he was purchasing the property." *Id.* (quoting RESTATEMENT (SECOND) OF TRUSTS § 443 cmt. a). In this case, no party disputes the fact that the Browns' tax liabilities had not yet been assessed at the time of the Wrenhaven Trust's funding.

The intention to create a PMRT may also be inferred when the circumstances are such that "the payor manages the property, collects rents, pays taxes and insurance, pays for repairs and improvements, or otherwise asserts ownership, and the acquiescence by the transferee in such assertion of ownership." *Id.* (quoting RESTATEMENT (SECOND) OF TRUSTS § 443 cmt. a). After the funding of the Wrenhaven Trust, the Browns continued to live at the Wrenhaven Property and to

make the utility and mortgage payments. However, because the transferee of the Wrenhaven Property was a trust set up for the benefit of Mrs. Brown and the Browns' four children, the continued maintenance of the home does not necessarily suggest an intent to deprive the Wrenhaven Trust of the beneficial ownership in the home. To the contrary, this conduct is arguably in line with an intention to gift the property to the Wrenhaven Trust, considering the identities of the trust's beneficiaries.[2]

The government has therefore failed to meet its burden of demonstrating that the Browns did not intend that the Wrenhaven Trust take beneficial ownership of the Wrenhaven Property at the time of the transfer. It has therefore also failed to establish that the Wrenhaven Trust is a nominee of the Browns and that any payment originating from the trust is property of the Browns. The origin of the down payment remains a disputed factual issue.

At this stage of the litigation, the imposition of a PMRT to the benefit of the Browns is improper. Mr. Holloway presents evidence to suggest that he provided approximately 64% of the purchase price through a mortgage taken out in his name and that the Meadowcrest Property purchase price payor and titleholder are therefore one and the same. Further, the government has failed to demonstrate that the Browns, rather than the Wrenhaven Trust, provided the remaining 36% of the purchase price. Thus, there remain material factual disputes regarding the payor of the Meadowcrest Property's purchase price and the appropriateness of imposing a resulting trust.

---

[2] The government points out that another court in the District of Utah found that the D.E. Brown Family Trust was a nominee of the Browns and that it held property in a resulting trust in favor the Browns. *Brown*, 2011 WL 4889520, at *24. That court's finding, however, does not have any bearing on the Wrenhaven Trust's status. In addition, that court concluded that the D.E. Brown Family Trust was a nominee of the Browns after a full trial, rather than at the summary judgment stage.

B. Constructive Trust

The government also argues that the Browns hold the Meadowcrest Property through a constructive trust. The imposition of a constructive trust is an equitable remedy used to prevent unjust enrichment. *In re Hock's Estate*, 655 P.2d at 1114. While a variety of circumstances warrant the imposition of a constructive trust under Utah law, the moving party in this case, the government, argues particularly for a constructive trust in equity requiring: "(1) a wrongful act, (2) unjust enrichment, and (3) specific property that can be traced to the wrongful behavior." *Wilcox v. Anchor Water Co.*, 164 P.3d 353, 362 (Utah 2007). As was the case with a resulting trust, the government fails to meet its burden to warrant imposition of a constructive trust.

1) Wrongful Act Prong

To meet the wrongful act requirement, the property holder must have obviously received the property by mistake or participated in active or egregious misconduct. *Wilcox*, 164 P.3d at 362.[3] In this case, the government alleges two possible wrongful acts. First, it alleges that the Browns' and Mr. Holloway's concealment of the Browns' interest in the Meadowcrest Property from creditors, including the government, constitutes a wrongful act. To support this contention, the government alleges that the Browns had actual or constructive knowledge of the fact that they were behind on their taxes at the time that the Meadowcrest Property was purchased and that they failed to record their interest in the property until 2016.[4] In addition, it notes that some of the Browns' monthly payments, which the government contends were mortgage payments, rather than

---

[3] Some Utah cases have also suggested that the improper conduct must have been directed at the beneficiary of the alleged constructive trust, *see Wilcox*, 164 P.3d at 362, though not all courts impose this requirement, *see Arlin Geophysical*, 2018 WL 4621748, at *8–9.

[4] At oral argument, the government also suggested that Mr. Holloway was on constructive notice of the Browns' tax liabilities because the United States had filed public notices of tax liens.

12

rent payments, were marked as "rent," allegedly in an attempt to conceal the Browns' interest in the Meadowcrest Property.

These facts are insufficient to demonstrate that the parties' agreement was intended to "obfuscate the Browns' interest in the Meadowcrest Property and frustrate their creditors." This is particularly the case regarding the alleged conduct of Mr. Holloway, the property holder. The government suggests that, because Mr. Holloway had constructive notice of the Browns' tax liabilities, he necessarily participated in this transaction to help the Browns evade their tax liabilities. To attribute intent to conceal the Browns' assets to Mr. Holloway based on constructive notice is a significant leap for the government to make. Further, Mr. Holloway claims that he was not aware of the Browns' tax liabilities and would not have engaged in the transaction if he had been aware of them.

Additionally, Mr. Holloway contests the suggestion that the Browns' monthly payments were mislabeled as rent. He argues that the parties had entered a lease with an option to purchase and that these payments were indeed rent payments. At the summary judgment stage, taking Mr. Holloway's factual allegations as true, the government has failed to establish that Mr. Holloway participated in any scheme to conceal the Browns' property interest.

Further, as has been addressed at length, whether the Browns hold an ownership interest in the Meadowcrest Property is disputed. Mr. Holloway argues that the parties had agreed to a lease and that the Browns therefore hold no ownership interest in the property. Further, it is not clear that the Browns, rather than the Wrenhaven Trust, contributed any of the property's purchase price. If the Browns do not have an interest in the Meadowcrest Property, then this transaction cannot have been intended to conceal an interest in that property. Thus, the government has not met its burden with regard to this alleged wrongful act.

Second, the government alleges that Mr. Holloway's attempt to claim an interest in the Meadowcrest Property is improper and that his conduct constitutes a wrongful act. This argument is similarly insufficient. Mr. Holloway obtained a mortgage for the purchase of the Meadowcrest Property and he now holds legal title to that property. There is no evidence to suggest that he obtained title to the property through any mistake. Additionally, as has been addressed, the court cannot say that he obtained that title as a result of active or egregious misconduct. The government cannot demonstrate that this transaction was intended to frustrate the Browns' creditors. It is entirely possible that Mr. Holloway entered a lease with a purchase option with the Browns, obtained a mortgage to fund his purchase of the property, and requested that the Browns provide the down payment in order to decrease Mr. Holloway's exposure to financial risk over the course of the parties' agreement.

Taking Mr. Holloway's factual allegations regarding the transaction as true, the government has failed to demonstrate that Mr. Holloway's attempt to retain ownership of the Meadowcrest Property is improper. Thus, neither of the wrongful acts set forth by the government are sufficient to fulfill the first requirement of an equitable constructive trust under Utah law.

2) Unjust Enrichment and Tracing Prongs

As a result of the government's failure to establish a wrongful act, its unjust enrichment and tracing arguments must similarly fail at this stage. The government contends that the Browns will be unjustly enriched by their evasion of taxes owed to the United States government, but the government has not met its burden to demonstrate that this evasion actually occurred. The government also argues that Mr. Holloway will be unjustly enriched as a result of his retention of the Meadowcrest Property, but again, this claim relies on the wrongfulness of his retaining an interest in the property. The unjust enrichment prong has not been established.

Similarly, the government fails to establish the third requirement, the existence of property that can be traced to the wrongful act. The government argues that the Meadowcrest Property fulfills this prong. As has been addressed, however, the government has failed to establish that a wrongful act occurred. Thus, no property can be traced to a wrongful act. In short, the government has failed to establish by undisputed facts any of the requirements for a constructive trust in equity under Utah law.

C. Nominee Inquiry

As has been noted, the enforcement of a nominee lien involves a two-step inquiry. The government has failed to adequately meet its burden on the first step, the application of state law to determine the nature of the party's interest in the property. Thus, the court need not address the second step in this inquiry, the nominee analysis under federal law.

II. **Fraudulent Transfer of the Meadowcrest Property**

The government also alleges that the Meadowcrest Property was fraudulently transferred to Mr. Holloway under the Utah Fraudulent Transfer Act ("UFTA").[5] The UFTA provides that a transfer made by a debtor is fraudulent as to a creditor if the transfer is made with "actual intent to hinder, delay, or defraud any creditor of the debtor." UTAH CODE § 25-6-5(1)(a). The government contends that the transfer of the Meadowcrest Property to Mr. Holloway falls under this definition and that the transfer is thus fraudulent.

Section 25-6-2(4) of the UFTA defines "creditor" broadly to mean a person who has a claim. *Nat'l Loan Inv'rs*, 952 P.2d 1067, 1069 (Utah 1998) (citing UTAH CODE § 25-6-2(4)). The statute further broadly defines "claim" to mean a right to payment. *Id.* (citing UTAH CODE § 25-6-

---

[5] The Utah Fraudulent Transfer Act was renamed and renumbered as the Utah Voidable Transactions Act in 2017. The government properly notes, however, that the former statute applies to this transfer because the transfer occurred prior to May 9, 2017. UTAH CODE § 25-6-406(2)(b).

2(3)). The government claims, and the Browns do not dispute, that the United States government has a right to payment from both Mr. and Mrs. Brown for unpaid tax assessments that have been reduced to judgments. Thus, neither party disputes that the United States is a creditor of the Browns as is defined under the statute.[6]

As has been addressed at length, however, whether the Browns transferred the Meadowcrest Property to Mr. Holloway is a disputed fact. Mr. Holloway provided approximately 64% of the Meadowcrest Property purchase price through a mortgage. He contends that the monthly payments that the Browns made toward the Meadowcrest Property's mortgage were monthly rent payments per the parties' lease agreement. Additionally, the Browns argue that the Wrenhaven Trust, rather than the Browns, provided the remaining 36% of the purchase price. It is therefore entirely possible that the Browns did not make a transfer of the Meadowcrest Property. And while the United States is a creditor of the Browns, the same cannot be said regarding either Mr. Holloway or the Wrenhaven Trust.

The government has failed to establish that the Browns transferred the Meadowcrest Property or provided any of the funds required to purchase the property as a matter of law. It is therefore not entitled to summary judgment on its claim to recover the Meadowcrest Property under the UFTA.

---

[6] The Browns and Wrenhaven Trust do argue that the government's claim is barred by Utah Code Section 78B-2-307(2), which provides a four-year statute of limitations on fraudulent transfer claims. This argument is without merit. "It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights." *United States v. Neilson*, 986 F.2d 1430, No. 91-4175, 1992 WL 401598, at *4 (10th Cir. 1992) (unpublished table opinion) (quoting *United States v. Summerlin*, 310 U.S. 414, 416 (1940)). The government's action is not barred by Utah's statute of limitations.

## CONCLUSION AND ORDER

The government has failed to meet its burden to establish that the Browns hold an interest in the Meadowcrest Property through either a resulting trust or a constructive trust. Further, the government has failed to meet its burden to establish that Mr. Holloway holds title to the Meadowcrest Property as a result of a fraudulent transfer from the Browns.

For the reasons articulated, the government's motion for summary judgment is **DENIED**.

Signed September 24, 2020

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge